UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| WALKER COUNTY HOSPITAL CORPORATION, d/b/a HUNTSVILLE MEMORIAL HOSPITAL, | Case No. 19-36300 |
| Debtor and Debtor in Possession.[1] | |

**DECLARATION OF STEVEN L. SMITH IN SUPPORT OF DEBTOR'S EMERGENCY MOTION FOR ORDERS: (I)(A) APPROVING BIDDING PROCEDURES AND BID PROTECTIONS, (B) PERMITTING DEBTOR TO DESIGNATE STALKING HORSE PURCHASER(S) AND GRANT BID PROTECTIONS, (C) SCHEDULING A HEARING TO CONSIDER APPROVAL OF THE SALE OF ASSETS, (D) APPROVING FORM AND MANNER OF NOTICE OF SALE, AND (E) GRANTING RELATED RELIEF; AND (II)(A) AUTHORIZING AND APPROVING SALE OF SUBSTANTIALLY ALL ASSETS OF WALKER COUNTY HOSPITAL CORPORATION FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND <u>UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF</u>**

I, Steven L. Smith, declare under penalty of perjury as follows:

1. I am an adult of sound mind and am competent to testify to the matters set forth in this declaration.

2. I am the Chief Executive Officer of Walker County Hospital Corporation, d/b/a Huntsville Memorial Hospital (the "***Debtor***"), the debtor and debtor in possession in this chapter 11 case (the "***Chapter 11 Case***").

3. I have served in my current capacity since February 2019.

4. I submit this declaration (the "***Declaration***") in support of the *Debtor's Emergency Motion for Orders: (I)(A) Approving Bidding Procedures and Bid Protections, (B) Permitting Debtor to Designate Stalking Horse Purchaser(s) and Grant Bid Protections, (C) Scheduling a*

---

[1] The last four digits of the Debtor's federal tax identification number are: 0960. The location of the Debtor's service address is: P.O. Box 4001, Huntsville, TX 77342-4001, Attn: Steven Smith.

4844-7968-7596.2-9785-1524.2

1

*Hearing to Consider Approval of the Sale of Assets, (D) Approving Form and Manner of Notice of Sale, and (E) Granting Related Relief; and (II)(A) Authorizing and Approving Sale of Substantially All Assets of Walker County Hospital Corporation Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (the "**Sale Motion**").[2]

5.  Capitalized terms have the meaning assigned to them in the Sale Motion.

6.  I have reviewed and am familiar with the Sale Motion and the relief sought in the Sale Motion.

7.  Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, upon relevant documents and information supplied to me by people who report to me or are officers or employees with the Debtor, upon information supplied to me by the Debtor's professionals, or upon my opinion based on my experience and knowledge with respect to the Debtor's business, finances and operations.

8.  If I were called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

I.  **Background on the Proposed Purchased Assets.**

9.  The Proposed Purchased Assets consist of substantially all operating assets of the Debtor.

II. **The Debtors' marketing efforts to date.**

10. In June 2018, the Debtor engaged Hammond Hanlon Camp, LLC ("**H2C**") to, among other things: (a) identify opportunities for a transaction; (b) advise the Debtor concerning

---

[2] Capitalized terms used in this Declaration and not otherwise defined shall have the meanings ascribed to them in the Sale Motion

4844-7968-7596.2-9785-1524.2

opportunities for a transaction; and (c) as appropriate, participate on the Debtor's behalf in negotiations concerning a transaction. Upon its engagement, H2C undertook a robust marketing process to solicit offers for a transaction for the sale of substantially all assets of the Debtor's estate.

11. From June 2018 through February 2019, H2C undertook a robust marketing process to obtain purchasers and potential bids for all or a portion of the Proposed Purchased Assets.

12. In consultation with the Debtor and the Debtor's professionals, H2C developed marketing materials generally describing the Debtor's assets and operations (the "***Offering Memorandum***"). Subsequently, the Offering Memorandum was provided to approximately thirty-six (36) entities and persons H2C had identified as entities or persons that may have an interest in purchasing all or some portion of the Debtor's assets.

13. As a result, twenty (20) interested parties requested confidentiality agreements, with twelve (12) interested parties executing confidentiality and nondisclosure agreements with the Debtor and being given access to extensive diligence information.

14. From July 2018 through the Petition Date, various of the twelve (12) parties in interest that executed confidentiality and nondisclosure agreements conducted diligence regarding the Debtor's assets and operations.

15. As a result, the Debtor received four (4) "expressions of interest" or other similar documents, each containing varying levels of specificity and conveying varying levels of actual interest in pursuing a potential transaction. Ultimately none of the expressions of interest resulted in a viable transaction.

16. Facing a lack of interested purchasers, in an effort to prevent the closure of the Hospital, the District indicated that it would consider purchasing the Debtor's assets via a joint

venture formed by the District in conjunction with Community Hospital Corporation ("**CHC**") through a section 363 sale under chapter 11 of the Bankruptcy Code.

### III. Negotiations regarding the Proposed Purchased Assets.

17. Since the District expressed a willingness to consider forming a joint venture and purchasing the Debtor's assets, negotiations have been ongoing.

18. Negotiations and ongoing marketing of the Proposed Purchased Assets has included—and continues to include—extensive business discussions, including telephone calls, in-person meetings between and among senior management, the parties' legal teams, and the parties' various advisors.

19. At this juncture, despite the best efforts of the Debtor and all parties involved, negotiation and finalizing of an asset purchase agreement for the Proposed Purchased Assets is ongoing.

20. The Debtor and potential purchasers for the Proposed Purchased Assets continue to negotiate, among other things, certain bid protections—including a break-up fee and expense reimbursement—which are necessary to induce a potential purchaser to execute a stalking horse purchase agreement and subject its offer to higher or otherwise better offers—and the scope of assets and liabilities to be purchased and assumed by the potential purchaser.

21. Nevertheless, given the financial condition of the Debtor, the Debtor, in consultation with its advisors, has determined that the continued marketing of the Proposed Purchased Assets as part of a court-approved auction process, including the ability to designate a stalking horse purchaser subject to certain limitations, is the best and most efficient way to maximize the value of the Proposed Purchased Assets for the Debtor, its estate, creditors of the Debtor's estate, and all parties in interest.

22.     Based on the extensive negotiations and diligence conducted to date, and considering the Debtor's extensive marketing process, the Debtors, in consultation with their advisors, have determined that beginning the court-approved process with the ability to designate a stalking horse purchaser and continued marketing of the Remaining Assets is the best and most efficient way to maximize the value of the Proposed Purchased Assets for the Debtor, its estate, creditors of the Debtor's estate, and all parties in interest.

23.     Given the significant marketing efforts undertaken and significant diligence done to date, based upon the Debtor's business judgment, after consultation with the Debtor's various advisors, the Debtor believes the process proposed in the Sale Motion—including the ability to designate a stalking horse purchaser for the Auction—will maximize recoveries from the Proposed Purchased Assets for the Debtor, the Debtor's estate, creditors of the Debtor's estate, and all parties in interest.

24.     In the Debtor's reasonable business judgment, after consultation with the Debtor's various advisors, the Debtor believes the proposed process is fair, reasonable, and will maximize recoveries from the Proposed Purchased Assets for the Debtor, Debtor's estate, creditors of the Debtor's estate, and all parties in interest.

IV.     **The Debtor's capital needs.**

25.     Pursuant to the relief sought pursuant to the *Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Secured Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expenses Status, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Scheduling a Final Hearing* (the "**Financing Motion**"), the Debtor will be required to meet certain deadlines with respect to the marketing and sale of substantially all assets of the Debtor (such deadlines, the "***Milestones***").

26. The proposed procedures and sales outlined in the Sale Motion provide the Debtor with the best avenue for meeting the Debtor to timely satisfy the Milestones.

27. In addition, as set forth in the budget attached to the Financing Motion, the Debtor's ability to continue as a going concern is finite, requiring a quick resolution to the nearly eighteen (18) month marketing process and sale efforts already undertaken by the Debtor.

## V.     Benefits of the relief sought in the Sale Motion.

28. The sale of all or a portion of the Proposed Purchased Assets is in the best interest of the Debtor, the Debtor's estate, creditors of the Debtor's estate, and other parties in interest.

29. Significantly, as set forth above, the relief sought in the Sale Motion will provide the Debtor the best avenue for meeting the Milestones.

30. The sale process contemplated by the Sale Motion is the best path for the Debtor to maximize the Debtor's return for the Proposed Purchased Assets, because the procedures proposed in the Sale Motion are designed to maximize the ultimate purchase price through a competitive bidding process.

31. In addition, the Bid Protections are (a) necessary to induce a Stalking Horse Bidder to negotiate and agree to the terms of a Stalking Horse Purchase Agreement and continue to commit significant capital through at least the conclusion of the Auction, without any assurance the Debtor's marketing efforts will not yield a higher or otherwise better offer and (b) consistent with bid protections offered in comparable transactions.

32. Moreover, the Bid Protections represent fair consideration for the substantial benefit a Stalking Horse Bidder confers upon the Debtor and its estate by negotiating and agreeing to the terms of a Stalking Horse Purchase Agreement and setting a floor on the purchase price for the Proposed Purchased Assets.

**VI.     Continued marketing will occur.**

33.     Following approval of the Bidding Procedures, the Debtor, with the aid of its professionals, will continue to market the Proposed Purchased Assets to potential buyers, in an effort to maximize the number of Potential Bidders for the Proposed Purchased Assets.

34.     Through the continued marketing efforts, the Debtor will provide the best opportunity to maximize the value obtained from the Proposed Purchased Assets.

**VII.    Conclusion.**

35.     Based upon the foregoing, it is my opinion that the relief sought in the Sale Motion and the process contemplated by the Sale Motion are in the best interest of the Debtor, the Debtor's estate, creditors of the Debtor's estate, and other parties in interest.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: November 11, 2019                               Respectfully submitted,

                                                                              /s/ Steven L. Smith
                                                                              Steven L. Smith
                                                                              Chief Executive Officer