**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| WALKER COUNTY HOSPITAL CORPORATION, d/b/a HUNTSVILLE MEMORIAL HOSPITAL, | Case No. 19-36300-DRJ |
| Debtor and Debtor in Possession.[1] | |

### DECLARATION OF STEVEN L. SMITH IN SUPPORT OF FIRST DAY MOTIONS

I, Steven L. Smith, declare under penalty of perjury as follows:

1.     I am an adult of sound mind and am competent to testify to the matters set forth in this declaration.

2.     I am the Chief Executive Officer of Walker County Hospital Corporation, d/b/a Huntsville Memorial Hospital (the "***Debtor***"), the debtor and debtor in possession in this chapter 11 case (the "***Chapter 11 Case***").

3.     I have served in my current capacity since February 2019.

4.     In such capacity, I am generally familiar with the Debtor's day-to-day operations, business and financial affairs, and books and records.

5.     While I am the Chief Executive Officer of the Debtor and work under the direction of the Debtor's Board of Directors, I am employed by Healthcare Management Partners, LLC ("***HMP***"), a restructuring advisory services firm, specializing in the healthcare industry.

6.     HMP has been providing restructuring advisory services to the Debtor, including the provision of officers and other professionals with restructuring experience in the healthcare industry, since March 2018.

---

[1] The last four digits of the Debtor's federal tax identification number are: 0960. The location of the Debtor's service address is: P.O. Box 4001, Huntsville, TX 77342-4001, Attn: Steven Smith.

7.      I have over thirty-nine (39) years of experience in the healthcare industry.

8.      During that time, I have advised clients on business strategy and planning, financial analysis, cash management, crisis management, market analysis, and operational improvements.

9.      Prior to joining HMP, I worked as the chief executive officer of Matagorda Regional Medical Center in Bay City, Texas, from 2008 through 2018.

10.     As chief executive officer of Matagorda Regional Medical Center, I provided day-to-day strategic and operational leadership for the fifty-eight (58) bed general acute care hospital, which had annual net revenues of approximately sixty-eight million dollars ($68,000,000) and four hundred fifty (450) FTEs, a freestanding wellness and rehabilitation center, an affiliated multi-specialty provider group, a primary care clinic, and a rural ACO.

11.     I was also involved in the formation of the Texas Rural Accountable Care Organization, serving as its board chair for three years.

12.     I have also previously served as, among other things, the: (a) chief executive officer of 372 bed Eliza Coffee Memorial Hospital, leading an 18-month turnaround, reversing a $4 million loss to a $6 million gain; and (b) president and chief executive officer of 286 bed Memorial Medical Center where I improved financial results from an operating loss to an EBITDA of over 11%, and led the creation of a 501(c)(3) operating company to lease and operate the hospital on behalf of the county.

13.     I have a Bachelor of Science in Business Administration from the University of Alabama and a Master of Science in Healthcare Administration from Trinity University.

14.     I am also a Board Certified Fellow (FACHE) designated by the American College of Healthcare Executives.

15.     I submit this declaration to assist this Court and parties in interest in understanding the circumstances compelling the commencement of this Chapter 11 Case and in support of: (a) the Debtor's petition for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"); and (b) the emergency relief that the Debtor has requested from this Court, pursuant to the motions and applications referenced in, and filed contemporaneous with, this declaration.

16.     Except as otherwise indicated in this declaration, all facts set forth in this declaration are based upon my personal knowledge, my discussions with other members of the Debtor's management team and the Debtor's advisors, and my review of the relevant documents and information concerning the Debtor's operations, financial affairs, marketing efforts, and refinancing and restructuring initiatives.

17.     If called to testify, I could and would testify competently to the facts set forth in this declaration.

**INTRODUCTION**

18.     The Debtor operates a community hospital (the "***Hospital***") located in Huntsville, Texas. As a non-profit, the Debtor is devoted to the health and well-being of its regional communities by providing exceptional care to its patients.

19.     While the Hospital has outpaced market trends in the region for admissions and revenue, and has little outstanding long-term debt, as a standalone hospital operator, the Debtor faces significant challenges in acquiring competitive pricing for necessary goods and services and favorable managed care contracts as compared to multi-hospital systems. As a result, the Hospital has significantly above average operating costs that exceed its revenue generation. In addition, the Debtor's over-extension into rural healthcare clinics and a failed lab venture and ambulatory surgery center, among other issues, have resulted in an unsustainable balance sheet and liquidity shortfall.

4817-1442-0115.7

20.     Faced with the foregoing, the Debtor has filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on November 11, 2019 (the "*Petition Date*") and engaged restructuring advisors to assist in the development and negotiation of a plan to restructure the Debtor's obligations.

21.     To fund this Chapter 11 Case, the Lenders (as defined herein), as proposed post-petition lenders, have agreed to provide up to $5 million in post-petition financing pursuant to a senior secured super-priority debtor-in-possession revolving loan, all as more fully described herein.  This financing is the result of good faith, arm's-length negotiations between the Debtor and the Lenders, as proposed post-petition lenders, and will provide the Debtor with the necessary liquidity to conduct this Chapter 11 Case, review and analyze the Debtor's options for effectuating a successful outcome, and expeditiously implement the best strategy for the Debtor, its estate, its creditors, and other parties in interest.

22.     This declaration is organized in sections as follows: (a) the Debtor's history and operational and capital structure; (b) the circumstances surrounding the commencement of this Chapter 11 Case; and (c) the evidentiary basis for the relief requested in each of the filings filed contemporaneous with this declaration in this Chapter 11 Case.

**I.     The Debtor's history and operations.**

**A.   The Debtor's corporate history and business operations.**

23.     The Hospital is a Joint Commission-accredited, not-for-profit acute care community hospital. Founded in 1927 to memorialize those lost in World War I, the facility has provided effective health care services, delivering quality care to the residents of Walker County and its surrounding communities for over 90 years. The Hospital is the largest healthcare provider in Walker County and the county's fourth-largest employer.

24.     In 1975, the Texas legislature authorized an enabling act to form the Walker County Hospital District ("***District***") to provide for the establishment of a hospital within Walker County. In 1977 the District, a political subdivision of the State of Texas, broke ground to construct the facility that is currently the Hospital. The Debtor and the District are party to that certain (i) Operating Agreement dated June 13, 2013 (as amended, the "***Operating Agreement***") and (ii) Lease Agreement dated June 13, 2013 (as amended, the "***Lease Agreement***" and together with the Operating Agreement, the "***Operating Documents***") pursuant to which the Debtor leases and operates the Hospital.

25.     The Debtor has operated the Hospital as a non-profit for the benefit of Walker County and the surrounding communities since June 2005.

26.     Beginning in 2008, the Debtor began expanding their line of business by (i) acquiring an ambulatory surgery center and imaging center, (ii) opening several rural health clinics and a standalone emergency department in Walker and surrounding counties, and (iii) acquiring certain laboratory assets.  All such business expansions were shuttered in 2018 and early 2019, with the exception of the imaging center and one rural health clinic which are still in operation.

**B.   The Debtor's corporate and capital structure.**

27.     The Debtor is a non-profit corporation organized under the laws of Texas. The Debtor is the sole member of its non-debtor affiliate, HMH Physician Organization ("***HMH PO***"), a non-profit health organization licensed by the Texas Medical Board, pursuant to chapter 162.001(b) of the Texas Occupations Code. Tex. Occ. Code § 162.

28.     As of the Petition Date, the Debtor's primary debt components included approximately $18.7 million in accounts payable, $1.5 million in capital leases, and $2 million in

4817-1442-0115.7

principal outstanding obligations owing pursuant to a credit facility with MidCap Financial Trust ("***MidCap***") as lender.

29.     In connection with the credit facility with MidCap, the Debtor and HMH PO are borrowers ("***Borrowers***") under that certain Revolving Loan and Security Agreement dated as of May 16, 2014 by and among the Borrowers and MidCap as lender (as amended, restated, supplemented, and otherwise modified from time to time, the "***Loan Agreement***"). Pursuant to the Loan Agreement, MidCap agrees to lend to Borrowers, on a joint and several basis, subject to the terms set forth in the Loan Agreement, revolving advances up to the maximum revolving commitment of $8 million.

30.     All amounts due and owing under the credit facility are secured by perfected, first priority liens on and security interests in the Borrowers' Receivables (as defined in the Loan Agreement), specified deposit accounts, cash, records, general intangibles, and the proceeds of the foregoing.

31.     The Borrowers defaulted under certain financial covenants under the Loan Agreement, including failing to meet the Fixed Charge Coverage Ratio as required by Section 10.2 of the Loan Agreement for each of the months of January through August 2019.  Notwithstanding efforts to cut costs to satisfy financial covenants, such defaults have persisted.

32.     Pursuant to the Loan Agreement, the credit facility was initially set to mature on May 12, 2017. The Borrowers and MidCap have entered into a series of amendments to the Loan Agreement extending the maturity date to November 15, 2019.

33.     The Debtor has continued to work collaboratively with MidCap towards a restructuring and sale of the Debtor's assets, and has successfully negotiated the terms of debtor

in possession financing needed to successfully run this Chapter 11 Case, as more fully described below.

## II.   Events leading to the Chapter 11 Case.

34.     Contrary to national and state trends of declining inpatient census, admissions at the Hospital have remained stable and the Debtor has grown its revenues in recent years. However, certain issues related to, *inter alia*, the Debtor's status as a standalone operator and unfavorable managed care contracts have left the Debtor with insufficient cash flow.

### A.   Standalone Hospital Challenges

35.     As a standalone hospital, the Debtor bears the full cost of increasingly expensive back office and support functions, while simultaneously having lower purchasing power and leverage in contract negotiations. This has resulted in the Debtor obtaining below market managed care contracts and unsustainable trade and payroll related balances.

36.     In 2018, the State of Texas shifted its health insurance coverage for state employees from United Healthcare to Blue Cross Blue Shield. This shift materially impacted the Debtor's revenue, as the Debtor's contract with Blue Cross Blue Shield has less favorable reimbursement rates and a large portion of the Hospital's patient population is employed by the State. The Debtor has been in negotiations with Blue Cross Blue Shield since 2016, in an attempt to obtain a managed care contract with the insurer at a fair market rate, but efforts thus far have remained unsuccessful.

### B.   Other Events

37.     Beginning in 2008, the Debtor opened several rural health clinics in and outside of Walker County. Despite hopes that these clinics would generate referrals to the Hospital, the Debtor incurred material operating losses in connection with the clinics.

38.     The Debtor also acquired a physician-owned ambulatory surgery center. Soon after the purchase, key physicians at the surgery center found alternative employment, resulting in

4817-1442-0115.7

insufficient surgery volumes to justify the high cost operating room investment. In early 2019, the Debtor shut down the ambulatory surgery center and consolidated the operations with the main Hospital. This consolidation resulted in an incremental positive cash flow of over $700,000 through the elimination of duplicate expenditures.

39.     In addition to the clinics and surgery center, in 2013 the Debtor operated a free standing emergency department in Madisonville, Texas that resulted in additional cash drain, and undertook a lab venture that was operational for a mere six months. These unsuccessful acquisitions and the working capital depletion to fund losses further limited the Debtor's cash flow available to meet its financial covenants and pay vendors.

40.     Finally, in 2017, the Debtor lost approximately $4 million in funding as a result of failing to qualify as a Medicaid Disproportionate Share Hospital. The Debtor failed to qualify primarily as a result of (a) the state changing its methodology to exclude prisoner patient days from the calculation and (b) fewer deliveries of Medicaid patients occurring during the auditing period due to the loss of key obstetricians at the Hospital and the closure of the Debtor's prenatal clinic, which closed as a result of flood damage caused by Hurricane Harvey.

### C.  Defaults Under the Operating Documents

41.     On January 9, 2018, the Debtor received notice from the District that it was in default under the Operating Documents. The Debtor and District entered into the Forbearance Agreement dated as of March 2018 (the "*First Forbearance Agreement*") and the Second Forbearance Agreement dated as of July 8, 2019 ("*Second Forbearance Agreement*", and together with the First Forbearance Agreement, the "*Forbearance Agreements*").

42.     Under the First Forbearance Agreement, among other things:

      a.     the Debtor agreed to engage Michael Morgan of HMP as the Debtor's Interim Chief Executive Officer;

4817-1442-0115.7

8

      b.      the District agreed to forbear from taking action under the "Notice of Breach" provided that the Debtor agreed to comply with the other terms of the Operating Documents as modified by the First Forbearance Agreement; and

      c.      the District agreed to abate the Restricted Rent Account monthly payments by the Debtor in the amount of One Hundred Fourteen Thousand ($114,000) per month, until the earlier of the following dates: (i) the date on which the First Forbearance Agreement is terminated by the District; (ii) the date on which such a transaction may be entered into with a third party that requires renegotiation of the Operating Documents; and (iii) the financial condition of the Debtor improved such that the District determined, in its sole discretion but after consultation with the Debtor's board of directors, that reinstatement of the Restricted Rent Account monthly payment should be reinstated.

43.      Pursuant to the Second Forbearance Agreement, the District agreed to, among other things:

      a.      forbear from exercising remedies under the Operating Documents until the earliest to occur of October 15, 2019 and the occurrence of an event of default under the Operating Documents or Forbearance Agreements; and

      b.      abate rent in the amount of $328,634.39 per month, until the earlier of the following dates: (i) the date the Second Forbearance Agreement is terminated by the District; (ii) the date on which such a transaction may be entered into with a third party that requires renegotiation of the Operating Documents; and (iii) the financial condition of the Debtor improves such that the District determines, in its sole discretion but after consultation with the Corporation Board, that reinstatement of the monthly payment is warranted.

44.      In connection with Second Forbearance Agreement, the Debtor and District entered into that certain Security Agreement, dated July 8, 2019, pursuant to which the District holds an interest in, among other things, the Debtor's personal property, fixtures, accounts, money, licenses and permits as security for the Debtor's obligations under the Operating Documents. The Debtor further executed that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement, Financing Statement, and Fixture Filing, dated July 2019, granting certain real and personal

property to the District as security for the outstanding rental obligations owed to the District and the Debtor's ongoing obligations under the Operating Documents.

45.     On October 25, 2019, the Debtor received a Notice of Termination of the Second Forbearance Agreement from the District.

**D.  Pursuit of strategic transaction.**

46.     In April, 2018 the Debtor engaged HMP to perform an operational and financial assessment of the Hospital. As a result of these efforts, pursuant to the First Forbearance Agreement, the Debtor hired Michael Morgan of HMP as the Interim Chief Executive Officer and John Moore of HMP as the Debtor's Interim Chief Financial Officer and undertook various cost cutting and revenue improvement measures, including the closure of the ambulatory surgery center and remaining clinics. In consultation with HMP and its advisors, the Debtor decided to undertake a process to identify potential transactions that could alleviate the Debtor's ongoing liquidity constraints.

47.     In June 2018, the Debtor engaged Hammond Hanlon Camp, LLC ("*H2C*") to, among other things: (a) identify opportunities for a transaction; (b) advise the Debtor concerning opportunities for a transaction; and (c) as appropriate, participate on the Debtor's behalf in negotiations concerning a transaction. Upon its engagement, H2C undertook a robust marketing process to solicit offers for a transaction for the sale of substantially all assets of the Debtor's estate.

48.     In consultation with the Debtor and the Debtor's professionals, H2C developed marketing materials generally describing the Debtor's assets and operations (the "***Offering Memorandum***"). Subsequently, the Offering Memorandum was provided to approximately thirty-six (36) entities and persons H2C had identified as entities or persons that may have an interest in purchasing all or some portion of the Debtor's assets.

4817-1442-0115.7

49.     As a result, twenty (20) interested parties requested confidentiality agreements, with twelve (12) interested parties executing confidentiality and nondisclosure agreements with the Debtor and being given access to extensive diligence information.

50.     From July 2018 through the Petition Date, various of the twelve (12) parties in interest that executed confidentiality and nondisclosure agreements conducted diligence regarding the Debtor's assets and operations.

51.     As a result, the Debtor received "expressions of interest" or other similar documents, each containing varying levels of specificity and conveying varying levels of actual interest in pursuing a potential transaction. Ultimately none of the expressions of interest resulted in a viable transaction.

52.     Facing a lack of interested purchasers, in an effort to prevent the closure of the Hospital, the District indicated that it would consider purchasing the Debtor's assets via a joint venture formed by the District in conjunction with Community Hospital Corporation through a section 363 sale under chapter 11 of the Bankruptcy Code.

### III.    Evidentiary support for the first day motions.[2]

53.     The Debtor has filed a number of first day motions, seeking entry of orders granting various forms of relief.

54.     As set forth in more detail below, I believe the forms of relief requested are necessary to enable the Debtor to operate with minimal disruption during the pendency of this Chapter 11 Case and to ensure the best outcome for the Debtor, its estate, its creditors, and other parties in interest.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the applicable motion.

4817-1442-0115.7

55.     I have reviewed each of the first day motions, including the exhibits and other attachments to the first day motions.

56.     I believe that the Debtor has satisfied the applicable standards for the relief requested in each of the first day motions and that this Court's grant of the requested relief is in the best interests of the Debtor's estate, its creditors, and other parties in interest.

57.     A description of the relief requested and the facts supporting each of the first day motions is set forth below.

58.     Based upon the foregoing and the facts below, I respectfully submit that the first day motions should be granted.

**A. Debtor's Emergency Motion for Entry of an Order Authorizing Certain Procedures to Maintain the Confidentiality of Patient Information As Required By Applicable Privacy Rules (the "*HIPAA Motion*").**

59.     Pursuant to the HIPAA Motion, the Debtor seeks entry of an order authorizing certain procedures to maintain the confidentiality of patient information, as required by the Health Insurance Portability and Accountability Act of 1996 ("***HIPAA***") and the Texas Medical Records Privacy Act ("***TMRPA***"), while providing required disclosure in this Chapter 11 Case.

60.     As detailed in this declaration, the Debtor is in the business of operating a facility that provides healthcare services to individual patients.

61.     In the ordinary course of the Debtor's business, the Debtor has access to and receives "Protected health information" and data relating to patients, which the Debtor is required to confidentially maintain, pursuant to HIPAA and TMRPA.

62.     Some of the patients could potentially hold actual or contingent claims against the Debtor's estate and, accordingly, under the Bankruptcy Code, the Debtor has a duty to list all such creditors on the Debtor's mailing matrices and bankruptcy schedules

63.     In an effort to comply with governing law, the Debtor proposes certain procedures to maintain patient confidentiality during the pendency of this Chapter 11 Case (the "***Privacy Procedures***").

64.     Given the nature of any information that may reveal the identity of patients, confidentiality in this context is of paramount importance.

65.     I believe the Privacy Procedures and the relief requested in the HIPAA Motion appropriately balance the need to maintain confidential patient information under HIPAA and TMRPA with the need for adequate disclosure under the Bankruptcy Code.

66.     Therefore, on behalf of the Debtor, I submit that this Court should approve the HIPAA Motion.

**B.     Debtor's Emergency Motion for Entry of an Order Authorizing the Debtor to: (I) Continue Insurance Coverage Entered Into Prepetition and Satisfy Related Prepetition Obligations; (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies; (III) Honor the Terms of Premium Financing Agreements and Pay Related Premiums; and (IV) Enter Into New Premium Financing Agreements in the Ordinary Course (the "*Insurance Motion*").**

67.     Pursuant to the Insurance Motion, the Debtor requests entry of an order authorizing the Debtor to (i) continue insurance coverage entered into prepetition and satisfy related prepetition obligations, (ii) renew, amend, supplement, extend, or purchase insurance policies, (iii) honor the terms of certain premium financing agreements and pay the related premiums, and (iv) enter into or renew certain premium financing agreements in the ordinary course of business.

68.     In the ordinary course of business, the Debtor maintains approximately fourteen (14) insurance policies that are administered by various third-party insurance carriers (collectively, the "***Insurance Carriers***").

69.     The policies maintained by the Debtor provide coverage for, among other things, the Debtor's property, general liability, automobile liability, excess umbrella liability, directors'

and officers' liability, employer's liability, operator's liability, and professional liability (collectively, the "***Insurance Policies***").

70.    A schedule of the Insurance Policies is attached to the Insurance Motion as **Exhibit B**.

71.    The aggregate annual premium for the Debtor's Insurance Policies is approximately $606,000, not including applicable taxes, surcharges, deductibles, and broker and consulting fees and commissions. The Debtor is also responsible for the payment of premiums for the Insurance Policies maintained by HMH PO of which the annual premium amounts to approximately $700,000.

72.    As of the Petition Date, I believe that the Debtor does not have any outstanding premium payments due and owing, however, on account of non-financed Insurance Policies, approximately $9,500 will become due and owing within the first twenty-one days of this Chapter 11 Case.

73.    In addition, pursuant to the Insurance Policies, I believe that the Debtor may be required to pay various deductibles or retention amounts (the "***Insurance Deductibles***"), depending upon the type of claim and Insurance Policy involved.

74.    Under certain Insurance Policies, the Insurance Carrier may pay claimants and then invoice the Debtor for any Insurance Deductible.

75.    In those situations, the Insurance Carrier may have prepetition claims against the Debtor.

76.    While I am unaware of any Insurance Deductibles that are due and owing as of the Petition Date, the Debtor nevertheless seeks authority, subject to the terms of any orders of this Court governing use of cash collateral or the incurrence of debtor in possession financing, to honor

4817-1442-0115.7

any amounts owed to an Insurance Carrier under an Insurance Policy to ensure uninterrupted coverage.

77.     A majority of the Debtor's Insurance Policies are paid pursuant to a premium financing agreement (the "*Premium Financing Agreement*") between the Debtor and Prime Rate Premium Finance Company. Pursuant to the Premium Financing Agreement, the Debtor is required to make nine monthly payments of $40,875.08. As of the Petition Date, there are five payments remaining, the next coming due and owing on December 1, 2019.

78.     I believe the relief requested in the Insurance Motion is necessary to ensure uninterrupted operations and is in the best interests of the Debtor and its estate. Therefore, on behalf of the Debtor, I submit that the Insurance Motion should be approved.

**C. Debtor's Emergency Motion for Entry of an Order (I) Authorizing Debtor's Proposed Form of Adequate Assurance of Payment to Utility Companies; (II) Establishing Procedures for Resolving Objections By Utility Companies; and (III) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Service to the Debtor (the "*Utilities Motion*").**

79.     Pursuant to the Utilities Motion, the Debtor requests entry of an order: (i) prohibiting the Utility Companies from altering, refusing, or discontinuing Utility Services to, or discriminating against, the Debtor on account of any outstanding amounts for services rendered prepetition, or any perceived inadequacy of the Debtor's proposed adequate assurance; (ii) determining that the Utility Companies have received adequate assurance of payment for future Utility Services; (iii) approving procedures pursuant to which Utility Companies may request additional or different assurances beyond those set forth in the motion; and (iv) approving procedures for resolving objections by Utility Companies.

80.     In the ordinary course of business, the Debtor obtains traditional utility services related to the day-to-day operation or maintenance of the Debtor's business from myriad utility

providers (each a "***Utility Company***" and collectively, the "***Utility Companies***") for, among other things, water, electricity, telephone, and internet services (the "***Utility Services***").

81.     Prior to the Petition Date, the Debtor has consistently made payments to the Utility Companies on a regular and timely basis. To my knowledge, there are no material defaults or arrearages with respect to the Debtor's undisputed invoices for Utility Services, other than the payment interruptions that may be caused by the commencement of this Chapter 11 Case.

82.     Uninterrupted Utility Services are essential to the continued operation of the Debtor's business and, consequently, to the success of this Chapter 11 Case. Should any Utility Company alter, refuse, or discontinue service, even for a brief period, I believe that the Debtor's business operations could be severely disrupted, and such disruption would jeopardize the Debtor's reorganization efforts and patient safety. Accordingly, the Debtor seeks to establish an orderly process for providing adequate assurance to Utility Companies without hindering the Debtor's ability to function as a going concern.

83.     On average, the Debtor pays approximately $107,000 each month for the Utility Services, calculated as a historical average over the last twelve months (or where historical averages were not available, based on projected expenditures).

84.     The Debtor estimates, and I agree, that the cost for the Utility Services during the next two weeks (not including any deposits to be paid) will be approximately $53,500.

85.     Of the Utility Providers, approximately four hold deposits in the aggregated amount of approximately $1,130.00.

86.     I believe the relief requested in the Utilities Motion is necessary to ensure uninterrupted operations and is in the best interests of the Debtor and its estate. Therefore, on behalf of the Debtor, I submit that the Utilities Motion should be approved.

4817-1442-0115.7

**D. Debtor's Emergency Motion for Entry of Interim and Final Orders: (I) Authorizing the Debtor to (A) Continue to Operate the Debtor's Cash Management System, (B) Pay Any Prepetition or Postpetition Amounts Outstanding on Account of Bank Fees, (C) Maintain Existing Business Forms in the Ordinary Course of Business, and (D) Continue to Perform Intercompany Transactions Consistent with Historical Practice; and (II) Granting Related Relief (the "*Cash Management Motion*").**

89.     Pursuant to the Cash Management Motion, the Debtor requests entry of interim and final orders: (i) authorizing the Debtor to (a) continue to operate the Debtor's cash management system, (b) pay any prepetition and postpetition amounts outstanding on account of associated bank fees, (c) maintain existing business forms in the ordinary course of business, and (d) continue to perform certain intercompany transactions consistent with historical practice; and (ii) granting certain related relief.

90.     In the ordinary course of business, the Debtor maintains an integrated cash management system (the "*Cash Management System*") in the day-to-day operation of the Debtor's business, to collect, manage, and disburse funds generated in connection with the Debtor's business.

91.     The Debtor designed the Cash Management System to meet the Debtor's operating needs, enable management to control and monitor corporate funds, comply with the requirements of its financing agreements, reduce administrative expenses by facilitating the movement of funds, and enhance the development of accurate account balances.

92.     The Debtor's treasury department maintains daily oversight over the Cash Management System and utilizes cash management controls for entering, processing, and releasing funds, including in connection with Intercompany Transactions (as defined below).

93.     The Debtor's accounting department regularly reconciles the Debtor's books and records to ensure that all transfers are accounted for properly.

**Debtor Bank Accounts.**

94.     The Cash Management System is composed of fourteen (14) Debtor-owned and controlled bank accounts (each a "***Bank Account***" and collectively, the "***Bank Accounts***") listed on **Exhibit C** attached to the Cash Management Motion with BBVA USA, US Bank, and First National Bank of Huntsville (collectively, the "***Cash Management Banks***").

95.     The Bank Accounts are primarily utilized to (a) pay operating expenses, and (b) receive payments from insurance providers, clients, credit card processors, and other parties. Certain Bank Accounts also facilitate the movement of funds to other accounts of the Debtor.

96.     Three (3) of the Debtor Bank Accounts are restricted accounts that hold donated funds raised and contributed by community members for the benefit of: (a) the Huntsville Memorial Hospital Batten Nurse Scholarship Fund; (b) the Huntsville Memorial Hospital FNB Vocational Nurse Scholarship Fund; and (c) the Walker County Hospital Corporation Mammogram Fund. Cash held in the restricted accounts is used solely for purposes of the scholarship and mammogram programs. As of the Petition Date, the total balance of these restricted accounts was approximately $130,000.

97.     The Debtor routinely deposits, withdraws, and otherwise transfers money to, from, and between certain of the Bank Accounts by various methods, including by wire transfer, internal transfer, zero balance account transfer, automatic clearing house transfer, and checks (collectively, the "***Ordinary Transfer Methods***").

98.     A diagram reflecting the flow of funds through the Bank Accounts in the Cash Management System is attached to the Cash Management Motion as **Exhibit D**.

99.     The amount of funds that flow through the Cash Management System on a monthly basis fluctuates greatly, depending on, among other things, new client deposits, census level, and depositing of checks in transit.

4817-1442-0115.7

**Non-Debtor Bank Accounts.**

100.     In addition to the Bank Accounts, the Cash Management System includes five (5) bank accounts (the "***Non-Debtor Accounts***") owned and managed by HMH PO.

101.     In the ordinary course of business, the Debtor utilizes the Cash Management System to make payments to, or create an intercompany claim that may be settled in cash, as the case may require, among the Debtor and HMH PO, pursuant to the Intercompany Transactions defined and described below.

**Bank Fees**

102.     The Debtor incurs periodic service charges and other fees in connection with the maintenance of the Cash Management System, which fees and services are generally paid each month (the "***Bank Fees***").

103.     The Debtor has historically incurred Bank Fees of approximately $7,000.00 per month, which are debited from the respective Bank Account for which the Bank Fee was incurred.

104.     As of the Petition Date, I understand that no Bank Fees have accrued and remain unpaid, however the Debtor seeks permission to pay any Bank Fees and continue paying the Bank Fees in accordance with past practices.

**Intercompany Transactions**

105.     The Debtor has historically and in the ordinary course of business engaged in routine business relationships with HMH PO, its non-debtor affiliate (the "***Intercompany Transactions***"), resulting in intercompany receivables and payables (collectively, the "***Intercompany Claims***") pursuant to contractual and non-contractual arrangements. As set forth below, the Intercompany Transactions are necessary in order to (i) comply with account control obligations under the Debtor's prepetition revolving loan with MidCap and (ii) to fulfill the Debtor's non-profit mission of providing quality healthcare to the community. A failure to

4817-1442-0115.7

continue to perform the Intercompany Transactions would impair the Debtor's ability to continue operations in the ordinary course of business to the detriment of the Debtor's estate and parties in interest and at significant risk to the Debtor's patients.

### Relationship of Debtor and HMH PO

106.    The Debtor is the sole member of its non-debtor affiliate, HMH PO. Debtor and HMH PO are parties to that certain Management Agreement dated November 1, 2008 pursuant to which Debtor provides HMH PO certain management and administrative services, including but not limited to, payroll servicing. In exchange, the physicians employed by HMH PO provide healthcare services at the Hospital, thus generating facility fees for the Debtor and servicing Debtor's patients. The Debtor does not directly employ physicians and accordingly is dependent on HMH PO to provide such practitioners.

107.    HMH PO is a borrower under the Debtor's prepetition Credit Facility with MidCap, however HMH PO has not commenced its own chapter 11 case. As a Borrower (as such term is defined the Loan Agreement) under the Credit Facility, HMH PO granted MidCap a first priority lien on HMH PO's Receivables (as defined in the Loan Agreement), specified deposit accounts, cash, records, general intangibles, and the proceeds of the foregoing (collectively, "***Collateral***").

108.    In connection with the Loan Agreement, the Debtor and HMH PO entered into that certain Depositary Agreement dated May 16, 2014 by and among the Borrowers, MidCap as successor to the lender, and Compass Bank (as amended, the "***Depositary Agreement***"). Pursuant to the Loan Agreement and Depositary Agreement, Debtor and HMH PO each daily sweep their respective accounts receivable collections that constitute Collateral into MidCap designated accounts for application to the Borrowers' outstanding obligations under the Credit Facility. MidCap then advances funds under the Credit Facility into a Debtor owned Bank Account in an amount based upon the total collections received from both the Debtor and HMH PO. MidCap

4817-1442-0115.7

does not separately fund borrowings under the Credit Facility to HMH PO. Accordingly, all borrowings under the Loan Agreement flow through Debtor owned accounts.

109.    As a result, HMH PO does not retain any cash from its self-generated collections and instead relies on the Debtor to transfer funds advanced from MidCap to HMH PO in an amount sufficient to cover HMH PO's operating expenses. Historically, HMH PO's collections have been equal to or less than its operating costs, depending on the productivity of the employed physicians and their collections rate for the prior week. The Debtor funds any shortfall in collections necessary to cover costs to ensure the physicians are able to continue providing services at the Hospital.

**The Intercompany Transactions are an essential component of the Debtor's operations**

110.    Absent the continued use of Intercompany Transactions and the payment of any prepetition Intercompany Claims, HMH PO will be denied access to its own generated cash and borrowings under the Credit Facility and will likely cease performing services at the Debtor's hospital. This would result in a material disruption to the Debtor's operations and could jeopardize patient safety.

111.    The Debtor has historically reflected the Intercompany Claims generated by the Intercompany Transactions as journal entry receivables and payables, as applicable, in the respective accounting system. The Debtor closely tracks all fund transfers in the respective accounting system and, therefore, can ascertain, trace, and account for all Intercompany Transactions. The Debtor intends to account for all postpetition Intercompany Transactions in accordance with past practice.

112.    Accordingly, the Debtor is seeking authority—and, to the extent applicable, relief from the automatic stay—to continue the Intercompany Transactions in the ordinary course of

4817-1442-0115.7

business on a postpetition basis in a manner substantially consistent with the Debtor's past practices.

### Existing Business Forms and Checks

113.    In the ordinary course of business, the Debtor uses a variety of checks, correspondence, and business forms.

114.    To minimize expenses to the Debtor's estate and avoid unnecessarily confusing the Debtor's employees and creditors, the I believe it is appropriate to continue to use the existing stock of checks, correspondence, and other business forms (including, without limitation, letterhead, purchase orders, and invoices) (collectively, the "***Business Forms***") as such forms were in existence immediately before the Petition Date—without reference to the Debtor's status as debtor in possession—rather than disposing of the existing forms and delaying operations until new Business Forms are obtained, or requiring the Debtor to include a legend on the Business Forms that could cause unnecessary confusion.

115.    After existing Business Forms are depleted, the Debtor's Business Forms will identify the Debtor's status as a debtor in possession.

116.    On behalf of the Debtor, I submit that the Cash Management Motion should be approved.

**E.   Debtor's Emergency Motion for Entry of an Order: (I) Authorizing the Debtor to (A) Pay Certain Prepetition Wages, Benefits, and Other Compensation and (B) Continue Employee Compensation and Employee Benefits Programs; and (II) Granting Related Relief (the "*Wages Motion*").**

117.    Pursuant to the Wages Motion, the Debtor requests entry of an order authorizing the Debtor to (a) pay, in the Debtor's discretion, prepetition amounts required under or related to Employee Compensation, Deductions and Payroll Taxes, and Employee Benefits (each as defined below and together with all fees, costs, and expenses incident to each, including amounts owed to

4817-1442-0115.7

third-party administrators, the "***Employee Obligations***") as set forth in the motion; and (b) maintain, and continue honoring and paying, in the Debtor's discretion, all amounts with respect to the Employee Obligations as such were in effect as of the commencement of this Chapter 11 Case and as such may be modified, amended, or supplemented from time to time in the ordinary course of business, including amounts owed to third-party administrators.

118.    In the ordinary course of business, the Debtor relies on the services of employed personnel (each, an "***Employee***") to conduct the operations of the Debtor's business.

119.    As of the Petition Date, the Debtor employs approximately 582 Employees. This total does not include persons employed by HMH PO.

120.    In the ordinary course of business, the Debtor pays Employees, among other things, salary, expense reimbursements, and certain other forms of compensation and benefits, depending on the services provided by the Employee to the Debtor.

121.    The Employees perform a variety of critical functions, including operating and administering the Debtor's medical centers, providing health care services, and recruiting and training nurses and technicians. Employees also engage in various functions to manage and support the operations of the Debtor's medical facility, including various administrative, marketing, legal, accounting, finance, and management-related tasks. A majority of Employees are highly skilled nurses and other medical professionals, and the skills and experience of the Employees are essential to the Debtor's ongoing operations.

**Employee Compensation.**

122.    The following summarizes the various types of Employee compensation offered by the Debtor (collectively, the "***Employee Compensation***"):

     *(i)      Employee earnings.*

123.    In the ordinary course of business, Employees generally are paid on a bi-weekly basis, with all Employees receiving their wages, salaries, and other compensation by direct deposit or by way of a "Paycard."[3]

124.    On average, the Debtor's gross payroll is approximately $1,100,000 per bi-weekly pay period.

125.    The Debtor pays its Employees' wage and salary obligations[4] (collectively, the "***Wages***") on either a salaried or hourly basis. In addition to Wages, the Debtor also pays certain eligible Employees sign on bonuses or employee referral bonuses (collectively, the "***Recruitment Incentives***" and together with Wages, "***Employee Earnings***").

126.    Recruitment Incentives are periodically adopted and revised by the Debtor in order to help with recruiting efforts for historically hard to fill positions. The Debtor is currently offering the following Recruitment Incentives: (i) sign on bonuses of $2,500 for a one year commitment and $5,000 for a two year commitment for qualified emergency, intermediate care, labor and delivery, medical, surgical, and correctional care registered nurses; (ii) a $1,500 sign on bonus for a one year commitment for qualified CT, MRI, and mammogram radiology technicians; and (iii) referral bonuses of $2,000 for Employees who refer a candidate for one of the positions identified in (i) or (ii) above who is hired by the Debtor. Recruitment Incentives are paid on a quarterly basis.

---

[3] Paycards are issued to Employees in lieu of a paper check for those Employees who either do not have a traditional banking account to receive direct deposits in or who have otherwise elected to receive payment of their earnings via Paycard. The Debtor's Paycards are issued by BBVA, enabling the Employee to use the card for cash withdrawals at ATMs, automatic bill payments, and at businesses that accept credit card payments.

[4] The Debtor provides shift differential payments ("***Shift Differential Payments***") to Employees who work hours other than those that are considered to be normal daytime shifts as partial compensation for working hours that might be inconvenient or cause disruption to normal personal life. The Employees receiving Shift Differential Payments is constantly changing as Employees frequently move from one shift to another. Shift Differential Payments are included in the Wages owed pursuant to the motion.

4817-1442-0115.7

127.    As of the Petition Date, twelve (12) Employees are receiving Recruitment Incentives.[5]

128.    As of the Petition Date, I understand that $1,070,000.00 in unpaid Wages are due and owing but no Recruitment Incentives are currently due; however, approximately $6,875.00 in Recruitment Incentives will become due and owing within the first 21 days of this Chapter 11 Case.

129.    Accordingly, I understand that the Debtor owes approximately $1,100,000.00 on account of accrued but unpaid Employee Earnings (excluding Payroll Taxes, Deductions, and Reimbursable Expenses (each as defined below)), all of which will become due and owing within the first 30 days of this Chapter 11 Case.

130.    It is my understanding that payment of accrued but unpaid Employee Earnings will not result in payments to any Employees in excess of the $13,650 priority cap in section 507(a)(4) of the Bankruptcy Code.[6]

131.    For the avoidance of doubt, the Debtor is not seeking authority to pay any Employee Compensation outside of the ordinary course of business and the relief sought herein does not implicate section 503(c) of the Bankruptcy Code.

*(ii)    Independent contractors.*

132.    In addition to the Employees, in the ordinary course of business, the Debtor employs independent contractors (the "***Independent Contractors***"). On average, the Debtor incurs expenses of approximately $4,000 per month in the aggregate on account of Independent

---

[5] Eleven (11) Employees are receiving sign on bonuses and one (1) Employee is receiving a referral bonus.

[6] Although the Debtor believes that no Employees' Employee Earnings will exceed the statutory cap when excluding accumulated obligations for Paid Time Off (as defined below), if accumulated Paid Time Off were included in calculating Employee Earnings, the Debtor believes certain senior Employees do exceed the statutory cap due to the large amount of unused Paid Time Off they have accrued. It is the Debtor's policy to pay out unused Paid Time Off to their Employees upon their termination so long as they provide at least two weeks' notice (or one months' notice for managers/directors).

Contractors' compensation (the "***Independent Contractor Obligations***"). As of the Petition Date, there is approximately $2,000 outstanding, on account of Independent Contractor Obligations.

### *(iii)    Reimbursable expenses.*

133.    Prior to the Petition Date and in the ordinary course of business, the Debtor reimbursed Employees, subject to manager approval, for certain allowed expenses, including, but not limited to: (a) expenses incurred on behalf of the Debtor while traveling on business (*e.g.*, airfare/rail, gas mileage, taxis, hotel and telephone/internet, and meals), (b) training courses and certifications, and (c) on-site meals (the "***Reimbursable Expenses***").

134.    In addition, the Debtor reimburses nurse practitioners for the costs of attending Continuing Medical Education courses ("***CME***") up to a capped amount of $1,500 per year.

135.    Employees pay for such expenses directly from their own funds and are reimbursed upon the submission of an expense reimbursement form itemizing the applicable business expenses.

136.    Reimbursement is contingent on the Debtor's determination that the charges are for legitimate, reimbursable business expenses.

137.    The Debtor's incurrence of Reimbursable Expenses varies from month to month. As a result, the Debtor cannot accurately estimate prepetition, unpaid Reimbursable Expenses, however, Reimbursable Expenses approximate to $1,000.00 per month.

138.    Employees incurred the Reimbursable Expenses as business expenses on the Debtor's behalf and with the understanding that they would be reimbursed.

139.    As of the Petition Date, I understand that no prepetition Reimbursable Expenses remain unpaid, however, to avoid harming Employees who incurred the Reimbursable Expenses, the Debtor requests authority to: (a) continue paying the Reimbursable Expenses in accordance with prepetition practices, including payment to and in adherence with the Debtor's policy for

4817-1442-0115.7

reimbursing Employees such expenses, and honor any prepetition obligations, if any, related to Reimbursable Expenses, to the extent Employees have paid for such expenses directly from their own funds or are otherwise personally liable for such expenses; (b) modify the Debtor's prepetition policy relating to Reimbursable Expenses as the Debtor deems appropriate, without the need for further court approval; and (c) pay all Reimbursable Expenses to Employees that (i) accrued prepetition and (ii) accrue postpetition but relate to the prepetition period.

### (iv)     *Company vehicles.*

140.     The Debtor provides certain Employees with access to vehicles that are fully expensed by the Debtor when required for business-related travel. The Debtor does not currently have any regular monthly expenses in connection with the ownership of these vehicles, however, regular maintenance and other costs arise in the ordinary course of business. The Debtor requests authority to pay any outstanding amounts and to continue to incur and pay ongoing expenses relating to company vehicles in the ordinary course.

141.     Fuel costs in respect of all company vehicles are paid by company gas card. The average monthly cost in connection with the company gas cards with respect to use of the Debtor's company vehicles is approximately $200. The Debtor requests authority to pay any outstanding amounts and to continue to incur and pay ongoing expenses relating to fuel costs in the ordinary course.

### (v)     *Holidays, paid time off, and leaves of absence.*

142.     The Employees are eligible for paid time away from work based on the Employee's length of service. These absences include holidays, personal illness, family illness, personal days, and vacation (collectively, "***Paid Time Off***").

143.     Paid Time Off can be carried over from year to year up to a maximum number of hours, depending on an Employee's length of service.

4817-1442-0115.7

144.     The Debtor anticipates that certain Employees will seek to use Paid Time Off accrued during the prepetition period after the Petition Date. As of the Petition Date, I understand that accrued liability in connection with unused Paid Time Off equaled approximately $970,000.00.

**Deductions and Withholdings.**

145.     During each applicable payroll period, the Debtor routinely deducts certain amounts from Employees' gross pay, including, without limitation, (a) pre-tax and after-tax deductions payable pursuant to the Employee Benefits (as defined below) discussed herein (*e.g.*, contributions relating to health care benefits, insurance premiums and flexible spending programs) and (b) other miscellaneous deductions (collectively, the "***Deductions***").

146.     On a monthly basis, the Debtor deducts and remits to appropriate third-party recipients approximately $344,000.00 from the Employees' paychecks for the Deductions.

147.     As of the Petition Date, I understand that the Debtor owes approximately $160,000.00 on account of prepetition Deductions. The Debtor requests authority to remit any unpaid prepetition Deductions that may exist and seeks authority to continue deducting amounts from the applicable Employee's Wages and forwarding Deductions to the appropriate third-party recipients on a postpetition basis, in the ordinary course of business, and consistent with past practices.

148.     In addition to the Deductions, the Debtor is required by law to withhold amounts related to federal income taxes, as well as Social Security and Medicare taxes for remittance to the appropriate taxing authority (collectively, the "***Withheld Amounts***"). The Debtor is also required to pay additional amounts for federal and state unemployment insurance (together with the Withheld Amounts, the "***Payroll Taxes***").

149.    On a monthly basis, the Debtor remits approximately $550,000.00 in Payroll Taxes, which amounts include employer taxes plus what is withheld and remitted on behalf of Employees.

150.    I understand that as of the Petition Date, approximately $250,000.00 of prepetition Payroll Taxes are outstanding (collectively, the "***Unremitted Payroll Taxes***"). The Debtor requests authority to pay any Unremitted Payroll Taxes outstanding and to continue remitting such Payroll Taxes postpetition in the ordinary course of business.

**Employee Benefits.**

151.    The Debtor offers Employees the opportunity to participate in a number of insurance and benefit programs, including medical insurance, life and disability insurance, education assistance, and other employee benefit plans as described below (collectively, the "***Employee Benefits***").

152.    Maintaining these benefits and honoring obligations with respect to these benefits is necessary to preserve employee morale and maintain the stability of the Debtor's workforce during the Chapter 11 Case.

*(i)     Medical, dental, and vision plans.*

153.    The Debtor provides health care coverage and dental care to all full-time Employees and their dependents under various benefit plans, as follows (collectively, the "***Medical, Dental and Vision Plans***"):[7]

> a.      *Medical Plan*. The Debtor pays medical claims submitted by Employee participants under the Blue Cross/Blue Shield of Texas administered plan (the "***BC/BS Claims***"). As a self-funded plan, the Debtor withholds specified portions of Employee wages and applies such funds to the satisfaction of stop loss premiums and a portion of the claims. BC/BS Claims are typically paid on a weekly basis, but are not always timely submitted by participants. The average monthly amount of BC/BS Claims is approximately $300,000. As of the Petition Date, the Debtor

---

[7] The Debtor also periodically provides benefits to former employees under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("***COBRA***"). As of the Petition Date, one employees is receiving COBRA benefits from the Debtor.

4817-1442-0115.7

estimates that approximately $78,000 of BC/BS Claims are outstanding based on the Debtor's current calculated lag rate, including those claims which may have not yet been submitted. In addition to the BC/BS Claims, the Debtor incurs monthly fees of approximately $78,000.

b.      *Dental Plan*. All full-time Employees are eligible to enroll in a dental plan, administered by CIGNA. Employees contribute 100% of the premium cost of their medical plans with pre-tax deductions from their paychecks.

c.      *Vision Plan*. All full-time Employees are eligible to enroll in a vision plan, administered by Superior Vision. Employees contribute 100% of the premium cost of their medical plans with pre-tax deductions from their paychecks.

154.     I understand that the Debtor pays approximately $378,000 in aggregate monthly premiums, BC/BS Claims, and administrative costs associated with the Medical, Dental and Vision Plans described above.

### (ii)     *Insurance and disability benefits.*

155.     The Debtor also provides eligible Employees with life insurance and accidental death and dismemberment coverage up to one years' salary (maximum of $200,000) (collectively, the "***Insurance and Disability Benefits***"). The Insurance and Disability Benefits are provided through CIGNA. The Debtor pays 100% of premiums for this coverage.The combined monthly premium for the Insurance and Disability Benefits is approximately $20,000.00.

156.     The Debtor also provides eligible Employees an option to purchase additional Insurance and Disability Benefits coverage (the "***Supplemental Insurance Benefits***"), the premiums for which are satisfied solely by participating Employees. The Debtor withholds from participating Employees' paychecks amounts sufficient to pay these premiums, but the Debtor pays certain costs related to the Supplemental Insurance Benefits. I understand that the Debtor remits a total of approximately $35,000.00 per month in aggregate premiums for the Supplemental Insurance Benefits.

4817-1442-0115.7

157.    As of the Petition Date, I understand that that no amounts for Insurance and Disability Benefits or Supplemental Insurance Benefits are outstanding, however, out of an abundance of caution, the Debtor requests authority to make any outstanding payments should the Debtor determine that any amounts are outstanding and to continue to pay such premiums and related costs on a postpetition basis in the ordinary course of business.

*(iii)    Workers' compensation.*

158.    The Debtor provides workers' compensation insurance for Employees (the "***Workers' Compensation Program***") at the statutorily-required level through Texas Mutual Insurance.

159.    The annual premium for the Workers' Compensation Program for the year 2019 is approximately $140,000, which amount is paid through an initial down payment of approximately $25,000 followed by twelve equal monthly payments in the amount of $9,500 each.

160.    I understand that, as of the Petition Date, no amounts for the Workers' Compensation Program are outstanding, however, out of an abundance of caution, the Debtor requests authority to make any outstanding payments should the Debtor determine that any amounts are outstanding.

161.    The Debtor currently has one Employee claiming benefits under the Workers' Compensation Program and requests authority to pay any unpaid amounts in connection with Workers' Compensation Programs, should any such amount be outstanding as of the Petition Date.

*(iv)    Employee savings plans.*

162.    The Debtor maintains for the benefit of eligible Employees an employee savings plan, administered through Lincoln Financial Group, which is a tax-qualified plan within the meaning of, and administered in accordance with, the requirements of section 403(b) and other applicable sections of the Internal Revenue Code (the "***403(b) Plan***").

4817-1442-0115.7

31

163.     The Debtor withholds certain amounts from participating Employees' paychecks and contributes such amounts to the 403(b) Plan (the "***Employee 403(b) Contributions***"). In addition to the Employees' contributions, the Debtor matches 50% of an Employee's salary deferrals up to 6% of the Employee's salary (the "***Employer 403(b) Contributions***"). The Employer 403(b) Contributions vest according to a vesting schedule based upon the Employee's tenure with the Debtor.

164.     The Debtor also maintains for the benefit of eligible Employees a separate employee savings plan for highly compensated individuals, administered through Lincoln Financial Group, which is a tax-qualified plan within the meaning of, and administered in accordance with, the requirements of section 457(b) and other applicable sections of the Internal Revenue Code (the "***457(b) Plan***" and together with the 403(b) Plan, the "***Employee Savings Plans***").

165.     The Debtor withholds certain amounts from participating Employees' paychecks and contributes such amounts to the 457(b) Plan (the "***Employee 457(b) Contributions***"). The Debtor does not provide any employer contributions/matches for the Employees participating in the 457(b) Plan.

166.     Eligible Employees also have the option of contributing to Roth IRA accounts (the "***Roth IRA Accounts***" and together with the 403(b) Plan and 457(b) Plan, the "***Employee Savings Plans***") administered through Lincoln Financial Group. The Debtor withholds certain amounts from participating Employees' paychecks and contributes such amounts to the Roth IRA Accounts (the "***Roth IRA Contributions***" and together with the Employee 403(b) Contributions, Employer 403(b) Contributions, and Employee 457(b) Contributions, the "***Employee Savings Plan***

*Contributions*"). The Debtor does not provide any employer contributions/matches for the Employees participating in the Roth IRA Accounts.

167.    I understand that the Debtor withholds a total of approximately $473,000.00 in Employee Savings Plan Contributions each month.

168.    In addition, the Debtor incurs various fees for the administration of the Employee Savings Plans, including (i) an annual $62,500 administrative fee to Lockton Investment Advisors, LLC, and (ii) an annual $15,000 portfolio modeling fee to Lockton Investment Advisors, LLC (collectively, the "*Employee Savings Plan Fees*"). I understand that no Employee Savings Plan Fees are currently due and owing.

### (v)    Retirement Plan

169.    Prior to 2005, the Debtor offered eligible Employees the ability to participate in a Debtor-funded retirement plan (the "*Retirement Plan*"). The Retirement Plan was frozen on December 31, 2004, however, payments are still being made to Employees who were participating in the Retirement Plan before that date. The Retirement Plan is not fully funded and, therefore, the Debtor is obligated to make quarterly payments to the Retirement Plan (the "*Retirement Plan Payments*"). The next Retirement Plan Payment of approximately $307,000 will become due and owing on December 31, 2019.[8]

170.    Rudd & Wisdom serves as the actuarial for the Retirement Plan and is compensated on a monthly basis. Rudd & Wisdom's compensation varies from month-to-month depending on

---

[8] The quarterly Retirement Plan Payments are not in equal installments. All 2019 quarterly Retirement Plan Payments except the December payment are $54,000. The actuarial, Rudd & Wisdom, conducts an annual actuarial valuation to project the next years' funding shortfall. Rudd & Wisdom is currently projecting next years' quarterly payments to be $113,000. Following the December 31, 2019 payment, the next quarterly Retirement Plan Payment will become due and owing on April 15, 2020.

4817-1442-0115.7

the services actually performed during the billing cycle, however, on average the Debtor pays

Rudd & Wisdom approximately $20,000 per month (the "***Actuarial Fees***").

171.    The Employees are an essential component of the Debtor's operations. The failure

to satisfy the Employee Obligations would result in Employee attrition and loss of morale during

a crucial time in this Chapter 11 Case. Therefore, on behalf of the Debtor, I believe the Court

should grant the Wage Motion.

**F.  Debtor's Emergency Motion for Entry of   Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Secured Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Status, (III) Granting Adequate Protection, (IV) Modifying the <u>Automatic Stay, and (V) Scheduling a Final Hearing (the "*DIP Motion*").</u>**

172.    Based on the Debtor's diligence into potential new funding sources, the Debtor has

determined that the DIP Facility presents the best viable mechanism for providing the liquidity

that the Debtor requires to continue its operations.  I believe that it is in the best interests of the

Debtor's business, creditors, and other parties-in-interest to commence the Chapter 11 Case with

the DIP Facility in order to pursue a sale of the Debtor's assets.

**The Terms of the DIP Facility were Heavily Negotiated and are the Only Terms on which the DIP Lender Will Provide the DIP Facility**

173.    Prior to the Petition Date, the Debtor and its advisors undertook a detailed

investigation as to the Debtor's projected financing needs during the pendency of the Chapter 11

Case and determined that the Debtor would require postpetition financing to support its operational

activities and sale process. After extended good faith, arm's-length negotiations, the Prepetition

Lender, as proposed DIP Lender, agreed to provide the DIP Facility on the terms provided in the

DIP Financing Documents, which are summarized in the DIP Motion.  Importantly, the DIP

Lender has agreed through the DIP Facility to remove certain reserves on the Debtor's borrowing

base that will result in $1.5 million of previously unavailable revolving loan availability under the

Prepetition Credit Facility.  I believe that the terms of the DIP Facility are reasonable and that the DIP Facility provides that Debtor with the liquidity necessary to conduct the Chapter 11 Case.

174.    Based on the extensive, good faith, arm's-length negotiations that took place prior to the Petition Date, it is my understanding that the DIP Lender would not have been amenable to providing financing without the heavily bargained-for protections detailed in the DIP Motion, and I believe that the Debtor would not be able to obtain financing from the DIP Lender other than financing secured by first priority priming liens.  I therefore believe that the DIP Facility provides the Debtor with the best, most feasible, and most value-maximizing financing option available at this time.

175.    Absent the DIP Lender's willingness and ability to fund the DIP Facility, the Debtor would likely run out of cash and would be forced to shut down its operations, threatening the Debtor's going concern value. Moreover, no third party lenders were in a position to provide as certain a financing arrangement on the terms currently available under the DIP Facility. Accordingly, I believe that the DIP Facility was negotiated with the DIP Lender in good faith, at arm's-length, and with the assistance of outside counsel, to obtain the required postpetition financing on terms favorable to the Debtor and that the certainty afforded by the DIP Facility — with respect to both its consensual nature as well as the likelihood of closing and the DIP Lender's support of the Debtor's sale efforts — provides additional and ample reason to authorize it.

**The Terms of the Debtor's Cash Collateral Use are Fair and Reasonable**

176.    In addition to the DIP Facility, the Debtor requires the continued use of their existing Cash Collateral, and the Prepetition Lender has consented to the Debtors' continued use of Cash Collateral subject to the terms of the Interim Order. I have been informed that the Debtor therefore has the requisite consent to use Cash Collateral.

4817-1442-0115.7

35

177.    The DIP Financing Documents ensure the Debtor's continued access to Cash Collateral. I believe that continued access to Cash Collateral will (a) ensure that the Debtor has access to sufficient working capital to, among other things, pay their employees, vendors, and suppliers, (b) enable the Debtor to continue honoring their prepetition obligations under and in accordance with other first-day orders entered by the Court, and (c) satisfy administrative expenses incurred in connection with the commencement of the chapter 11 case.

**The Adequate Protection Offered to the Prepetition Lender is Justified**

178.    The Debtor and the Prepetition Lender have agreed on the adequate protection described in the DIP Motion, including compliance with the Budget, replacement liens, superpriority claims, and payment of weekly interest and fees and expenses that will adequately protect the Lender's interests in the Prepetition Collateral from diminution in value caused by the Debtor's use of the Cash Collateral, as well as for any decline in, or diminution of, the value of the Prepetition Lender's liens or security interests under the Prepetition Credit Documents.

179.    In addition to the adequate protection itself, I believe the Debtor's preservation of estate assets through the use of Cash Collateral serves as its own form of adequate protection. Indeed, the Debtor's secured creditors will inherently benefit from the Debtor's proposed use of the Cash Collateral, which will prevent diminution of the value of the Prepetition Collateral and enhance the likelihood of preserving and maximizing the Debtor's overall going concern value.

**The DIP Facility Was Negotiated in Good Faith**

180.    I believe that the DIP Facility is the result of the Debtor's reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain needed postpetition financing, and of extended arm's- length, good faith negotiations between the Debtor and the DIP Lender. I believe the terms and conditions of the DIP Facility are fair and reasonable,

4817-1442-0115.7

and the proceeds under the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. I also believe that no consideration is being provided to any party to the DIP Facility other than as described in the DIP Motion.

**Modification of the Automatic Stay Is Warranted**

181.    As part of the relief requested in the DIP Motion, the Debtor has requested certain modification to the automatic stay.  These provisions were part of the quid pro quo for the Debtor's ability to obtain the DIP Facility and use Cash Collateral as provided in the DIP Financing Documents and in the Interim Order. Notably, the exercise of remedies will be subject to three Business Days' notice to allow the Debtor to cure or seek other relief.  Under these circumstances, I believe that the extent of the modifications to the automatic stay under the Interim Order is reasonable and should be approved.

**The Debtor Requires Immediate Access to Cash Collateral and the DIP Facility**

182.    I believe the Debtor and its estate will suffer immediate and irreparable harm if the interim relief requested in the DIP Motion, including authorizing the Debtors to use the Cash Collateral and to borrow up to $5 million, including $1.5 million in "new money" resulting from the release by the DIP Lender of certain reserves under the Prepetition Credit Facility, is not granted promptly. I further believe that the commencement of the chapter 11 case has already and will continue to significantly increase their expenses as a result of, among other things, the costs of administering the chapter 11 case and addressing key constituents' concerns regarding the Debtor's financial health and ability to continue operations in light of the chapter 11 case.  I believe that, unless the Court approves the Debtor's interim access to the DIP Facility funds, it is likely that the Debtor will run out of cash in the near term. Accordingly, I believe that the Debtor has an immediate need for access to liquidity to, among other things, permit the orderly continuation of

the operation of their business, to make payroll, and to satisfy other working capital and operation needs, all of which are required to preserve and maintain the Debtor's going concern value for the benefit of all parties in interest.

183.     Based on these circumstances, the Debtor requires the interim funding provided by the DIP Facility to avoid immediate and irreparable harm to its operations, businesses, and estates. Accordingly, on behalf of the Debtor, I respectfully submit that the Court should approve the DIP Motion.

**G. Debtor's Emergency Motion for an Order Extending the Time to File (I) Schedules of Assets and Liabilities, (II) Statements of Financial Affairs, and (III) Rule 2015.3 Financial Reports (the "*Schedule Extension Motion*").**

184.     Pursuant to the Schedule Extension Motion, the Debtor requests entry of an order (i) granting the Debtor a total of 30 days from the Petition Date (the "***Extension Period***") to file the Schedules and Statements, without prejudice to the Debtor's ability to request an additional extension of time should it become necessary; (ii) extending the deadline by which the Debtor must file its initial reports of financial information, or to file a motion seeking a modification of such reporting requirements for cause, with respect to entities in which the Debtor holds a controlling or substantial interest as set forth in Bankruptcy Rule 2015.3 (the "***2015.3 Reports***") to the later of: (a) 30 days after the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code (the "***341 Meeting***") or (b) 30 days from the Petition Date, without prejudice to the Debtor's ability to request additional extensions for cause shown, and (iii) granting such other and further relief as is just and proper.

185.     The size and complexity of the Debtor's business operations and the number of creditors likely to be involved in this Chapter 11 Case will make it difficult for the Debtor's management to complete the Schedules and Statements within the required time period. Further, given the numerous critical operational matters that the Debtor's accounting and legal personnel

4817-1442-0115.7

must address in the early days of this Chapter 11 Case and the volume of information that must be compiled and reviewed, I believe that the Debtor will be unable to complete the Schedules and Statements within the time provided under Bankruptcy Rule 1007.

186.    Accordingly, given the volume and complexity of the information that must be compiled and reviewed, in addition to the substantial burdens already imposed on the Debtor's management by the commencement of this Chapter 11 Case, the limited number of employees available to collect the information, and the competing demands upon employees, I believe that "cause" exists to extend the Schedules Deadline through and including December 11, 2019, which will give the Debtor a total of 30 days after the Petition Date to file the Schedules and Statements. The requested extension and waiver will enhance the accuracy of the Schedules and Statements and avoid the necessity of substantial subsequent amendments.

187.    Accordingly, on behalf of the Debtor, I submit the Schedule Extension Motion should be granted.

**H.  Debtor's Application for Order Appointing Epiq Corporate Restructuring, LLC as Claims, Noticing, Solicitation, and Administrative Agent (the "*Claims Agent Application*").**

188.    Pursuant to the Claims Agent Application, the Debtor seeks entry of an order appointing Epiq Corporate Restructuring, LLC ("*Epiq*") as the claims agent (the "*Claims Agent*") for the Debtor and their Chapter 11 Case, including assuming full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Debtor's Chapter 11 Case. The Debtor submits  that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise.

189.    Although the Debtor has not yet filed their schedules of assets and liabilities, they anticipate that there will be in excess of 5,000 entities to be noticed. In view of the number of anticipated claimants and the complexity of the Debtor's business, I submit that the appointment

4817-1442-0115.7

of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtor and/or the Office of the Clerk of the Bankruptcy Court of the administrative burden of, noticing, administering claims, and soliciting and balloting votes and is in the best interests of both the Debtor's estate and their creditors.

190.    Accordingly, I believe that appointing Epiq as the claims, noticing and balloting agent in this Chapter 11 Case will maximize the value of the Debtor's estate for all of their stakeholders and should therefore be approved by the Court.

## I.   Debtor's Emergency Motion for Entry of an Order Authorizing the Debtor to (I) Maintain, Administer, Modify, and Renew Their Refund Programs and Practices and (II) Honor Obligations Related Thereto (the "*Refunds Motion*").

191.    Pursuant to the Refunds Motion, the Debtor requests entry of an order (a) authorizing the Debtor (i) to maintain, administer, modify, and renew its Refund Program and make payments to patients and allow offsets by Third-Party Payors or to otherwise honor accrued prepetition obligations owed under its Refund Program (collectively, and as identified herein, the "*Refund Program Obligations*") and (ii) to continue, replace, modify, or terminate any Refund Program in the ordinary course of business, (b) authorizing and directing financial institutions to receive, process, honor, and pay all related checks and electronic payment requests for payment of Refund Program Obligations, and (c) granting related relief.

192.    Various state and federal laws require the Debtor to refund patients and third-party payors, including healthcare insurers, managed care organizations, workers' compensation programs, contract management services, private pay sources, Medicare, and Medicaid (collectively, "*Third-Party Payors*"), when overpayments are identified.  In the ordinary course of business, the Debtor routinely issues refunds or is subject to offsets for reimbursement of overpayments made by or on behalf of patients resulting from the interaction between the Debtor's

billing procedures, patient medical insurance deductibles, and third-party payments (the "**Refund Program**").

193.    The case-by-case nature of the Debtor's medical services makes the process of determining each patient's insurance coverage particularly complex. As a result, whether due to data input errors during claims processing, or overpayments arising from coordination-of-benefits issues among multiple insurers, patient accounts—once fully processed—may contain credit balances. Once the Debtor receives payments from patients or insurers, the Debtor reviews accounts that have credit balances and refunds any surplus to the patient or are subject to an offset to the Third-Party Payor's receivable balance based on an overpayment, as required.

194.    When the Debtor discovers and verifies an overpayment from a patient or Third Party Payor, the amount of the overpayment is reviewed in the Debtor's billing system, which then administers refunds to the patient as appropriate. Offsets by Third-Party Payors are reconciled by the Debtor after the offset occurs. There is typically a significant lag between when the patient is treated, when the overpayment is recognized or determined, and when the overpayment is reviewed in the Debtor's billing system. After the overpayment amount is determined, either the Debtor issues a check or other form of payment to the patient or the Third Party Payor offsets future receivables in the amount of the overpayment.

195.    At any given time, it is difficult to determine the amount of outstanding overpayments that have been made and identified, but for which a refund check or offset has not yet been issued. Moreover, some refund checks issued to patients before the petition date may not have been presented for payment or may not have cleared the Debtor's banking system or accounting system and, accordingly, have not been honored and paid as of the petition date. Nonetheless, the Debtor is required, under various laws, to reimburse patients and Third-Party

Payors as overpayments are identified. I understand that approximately $20,000 in refunds to patients or Third-Party Payor offsets are processed in a given month, although larger amounts of refunds may be due and owing at any given time.

196.    As of the Petition Date, the Debtor estimates that approximately $1,955,000 in refunds and credit balances may be due and owing under the Refund Program, of which approximately $14,000 could become due and owing during the first 21 days of this Chapter 11 Case. Failure to honor the Refund Program Obligations could materially harm the Debtor's going concern vale to the detriment of the Debtor and its estate. Accordingly, I submit that the Refund Motion should be approved.

[*Remainder of Page Intentionally Left Blank*]

Pursuant to 28 U.S.C. § 1746, under penalty of perjury, I declare the foregoing is true and correct, to the best of my knowledge, information, and belief.

Dated: November 11, 2019                           Respectfully submitted,


                                                   _____/s/ Steven L. Smith_____
                                                   Steven L. Smith
                                                   Chief Executive Officer